1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   ANTHONY MILTON                    )    No. C 12-05758 EJD (PR)
                                      )
9                  Petitioner,        )    **ORDER DENYING PETITION FOR**
                                      )    **WRIT OF HABEAS CORPUS;**
10        v.                          )    **DENYING CERTIFICATE OF**
                                      )    **APPEALABILITY**
11                                    )
    GERALD JANDA, Warden,             )
12                                    )
                   Respondent.        )
13                                    )
    _____  )
14

15        Petitioner, represented by counsel, has filed a petition for a writ of habeas

16   corpus under 28 U.S.C. § 2254 challenging his state conviction.  For the reasons set

17   forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

18                        **PROCEDURAL BACKGROUND**

19        On August 10, 2009 an Alameda County jury convicted Petitioner of first

20   degree murder with the special circumstance of committing the murder during a

21   robbery, with an enhancement for discharge of a firearm resulting in death.  2 Court

22   Transcript ("CT") 386, 644; 4 Reporter's Transcript ("RT") 768-69.  On November

23   20, 2009, Petitioner was sentenced to life in prison without the possibility of parole.

24   2 CT 647-48.

25        On May 10, 2011, the California Court of Appeal affirmed Petitioner's

26   judgment in an unpublished decision.  Ex. H, People v. Milton, 2011 WL 1782338

27   (Cal. Ct. App. May 10, 2011).  The California Supreme Court denied review on

28   August 10, 2011.  Ex. I.

**United States District Court**
For the Northern District of California

On August 6, 2010, Petitioner filed a petition for a writ of habeas corpus in the California Court of Appeal, which was denied on August 11, 2010.  Exs. J, K  The California Supreme Court denied review on October 20, 2010.  Ex. K.

On November 8, 2012, Petitioner filed this federal habeas petition.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the facts as follows:

A. Prosecution Case

On the night of December 1, 2003, defendant was driving his 1988 Buick Skylark in the vicinity of High Street in Oakland, accompanied by his brother, Juan Milton, his cousin, Fred Collins, and friends, Arturo Stern (also known as Toro) and Dante Petty.  He had just purchased the Buick that day from a neighbor.  About 11:00 p.m., defendant parked his car on Bancroft Way near 46th Avenue.  As they got out of the car, defendant handed Juan his Intra-Tech nine-millimeter semi-automatic firearm (Tech-9) and asked him to hold it.  Defendant told Juan he had the gun because someone named Laron was trying to kill him.  Defendant and his companions walked up 46th Avenue and joined Mia Smith and her boyfriend, William Simpson, who were sitting outside with friends on the front porch of an apartment where one of Simpson's relatives lived.  As soon as they got to the porch, defendant took his gun back from Juan.  At some point, one or two police cars turned onto 46th Avenue.  Everyone on the porch ran into the backyard to avoid contact with the police.  Defendant ran to his car on Bancroft and moved it one block, from Bancroft at 46th Avenue to Bond Street at 46th.  Smith and Simpson got into Smith's white Saturn and drove to a motel on High Street where they checked in.

Defendant and Juan were walking toward Bond on 46th Avenue when they saw two Hispanic men  FN2  and a Hispanic woman, later identified as Perla Hilarios, walking toward them on the opposite side of the street.  FN3  Toro was standing at the corner of 46th Avenue and Bond watching.  Defendant and Juan crossed the street and approached Hilarios and her companions.  Defendant was holding his gun in his hand.  At first, defendant pointed his gun toward one of the men, who was wearing a poncho.  Then he pointed the gun toward the other Hispanic male and told Juan to check his pockets for money.  Juan put his hands into the man's pockets but found no money.  Juan thought defendant wanted money because he had spent all his money on the Buick.

> FN2  Other testimony established that three Hispanic males were present when the ensuing events occurred.

> FN3  Although defendant and Juan did not know Hilarios, Smith had seen her on 46th Avenue before, and knew that her boyfriend's brother lived next door to the apartment where Simpson's relatives lived.

United States District Court

For the Northern District of California

As Juan was going through the man's pockets he heard defendant say, "He got a gun," apparently referring to the man wearing the poncho. Right after that, defendant fired his weapon. He fired the first shot. Hilarios immediately fell to the ground. The man wearing the poncho shot back and defendant and Juan started running toward Bond Street. By the time they reached defendant's car, Juan realized he had been shot in the leg, and defendant was bleeding from his chest. FN4

> FN4  Most of the foregoing account is based on Juan's statements during a December 2, 2003 interview by Sergeant Louis Cruz. A tape of the interview was played for the jury and a transcript was provided to aid jurors in following it. As further discussed post, Juan gave conflicting versions of what occurred in that interview, and testified at his own trial and again at defendant's trial that many of his inculpatory statements to Cruz and others were not true.

Elizabeth Tofting, who lived on 46th Avenue, heard male and female voices arguing loudly in English and Spanish in front of her house. A female said, "Everything is okay. Everything is cool," a couple of times. Ten to 15 seconds later, Tofting heard rapid gunfire that sounded continuous, followed by slower gunfire that sounded like a shot followed by a pause followed by another shot. The shots sounded like they came from different guns. She heard 5 to 10 shots in all. A man she believed was Hilarios's boyfriend knocked on her door and asked her to call 911. After the police arrived, Tofting came outside and observed Hilarios lying on the ground face down, not moving. Hilarios had suffered massive head injuries and died at the scene. An autopsy later established she died of a single gunshot to the head, entering through the center of her forehead. A bullet recovered from Hilarios's head was consistent with cartridges ultimately recovered from defendant's Tech-9. Three nine-millimeter casings found at the scene were found to have been fired from the Tech-9.

Raquel Barrios, who lived on Bond Street, was woken by the sound of approximately 15 gun shots. The first set of gunshots was louder than the second set. The first set sounded to Barrios like .45-caliber bullets, and the second sounded like .20- or .22-caliber bullets. Barrios looked out her window and saw two men pick up another man and put him in the back seat of a car. A white car pulled up and the occupants of the two cars talked to each other.

Smith testified she and Simpson spent about 30 minutes at the motel before deciding to drive back to 46th Avenue. As Smith turned left from Bancroft onto 46th Avenue, she saw two Hispanic males running to the corner. She saw a body lying face down on the ground with a man standing over it, yelling for help. At that point, Simpson told Smith to "drive off," and she turned onto Bond Street, where she saw defendant, Juan, and a couple of others getting into their car. Simpson had a brief conversation with the men through the passenger-side window, which Smith could not hear. Smith and Simpson drove to a gas station, where Juan and defendant met them. Defendant was in the back seat in a fetal position with his eyes closed. Juan handed a gun to Simpson. Smith and Simpson drove

United States District Court

For the Northern District of California

back to the motel and Simpson placed the gun, later identified as defendant's Tech-9, in the nightstand drawer, along with a 33-round ammunition clip for the weapon containing 14 live rounds. The police arrived at the motel early the next morning and recovered the weapon and ammunition from the nightstand. Simpson had also placed his own weapon in the nightstand, a nine-millimeter High Point. The Tech-9 trigger pull was measured at six and one-half pounds, which was higher than most weapons of this kind.5

> FN5 The California Highway Patrol eventually recovered the .25-caliber Raven pistol fired at Juan and defendant by the Hispanic man wearing the poncho. Defendant's Tech-9 had a bigger cartridge and louder sound than the Raven.

After meeting Smith and Simpson at the gas station, Toro and Juan drove defendant to the Highland Hospital emergency room and dropped him off. Defendant identified himself there as Juan Milton. Juan did not seek medical attention at Highland Hospital because defendant "was on the run from [a] juvenile facility," and Juan knew defendant was going to use his name. Defendant was treated in the Highland Hospital trauma room and transferred to the intensive care unit. After dropping defendant off at Highland Hospital, Toro drove Juan to the Kaiser Hospital emergency room, and left him there.

At 4:06 p.m. on December 3, Sergeant Cruz questioned defendant at Highland Hospital after giving him <u>Miranda</u> FN6 warnings. Defendant was in a hospital bed and hooked up to machines. Cruz recorded the interview, and the recording was played for the jury. During the interview, defendant admitted he was holding the Tech-9 gun. When defendant noticed Cruz holding a picture of the nine-millimeter High Point found in Simpson's hotel room, he asked Cruz if that was the gun he had been shot with. When Cruz asked defendant to describe the gun used to shoot him, defendant said he had never seen it. He added, "First we was talkin'. . . . [] . . . [] And then I just started shootin'." Defendant said he did not know if Juan got any money from their pockets "cuz right after he went in the pockets, they shot me." He stated, "I guess he felt disrespected when [Juan] went in his pockets, so that's when [inaudible] shoot." Defendant said he did not know who he shot, "I just know I shot towards they way." Defendant told Cruz he brought out his gun to scare the men, but it "[t]urned into a whole different thing."

FN6 <u>Miranda v. Arizona</u> (1966) 384 U.S. 436.

Juan initially told Cruz he received the gunshot wound to his leg when he was the victim of a robbery at a taco truck. He said a Latino in a poncho shot him. Cruz, who already had evidence of Juan's involvement in the 46th Avenue shootings, accused him of being untruthful. At that point, Juan became emotional and admitted he had not told the truth. Cruz began to ask Juan more directly about what happened on 46th Avenue. Juan then offered a different version of the shooting in which he was confronted by two Mexicans on 46th Avenue who asked him, "What you got?" and were about to hurt him or rob him. He called out to his brother, and told defendant the men were trying to do something to him. Defendant ran up, pulled out his gun, and "told 'em why was they doin' that shit?"

United States District Court

For the Northern District of California

1
2
3
4

When one of the men pulled out a gun, defendant started shooting, the Mexicans shot back, and Juan and defendant ran to their car. Only after Cruz confronted him with a picture of the recovered murder weapon did Juan admit that he had started to go through one of the men's pockets for money before the shooting started, or that defendant had shot the female first and he had seen her fall to the ground.

5

B. Defense Case

6
7
8
9
10
11

The defense called a single witness, Frederick Collins. Collins testified that on the evening of December 1, 2003, he accompanied Toro, Dante Petty, and his cousins-Juan and defendant-to a liquor store to buy alcohol and then to 46th Avenue between Bond and Bancroft. Defendant wandered off when they got out of the car. Collins, Juan, and either Toro or Petty were walking on 46th Avenue on their way to a burrito truck when a Mexican man and woman approached from the opposite side of the street. Collins slowed down but Juan kept walking toward them. The man and woman started arguing with Juan and yelling at him "like they were fixin' to rob him."

12
13
14
15
16

Juan told the man and woman, "You ain't getting' shit from me." The man pulled out a gun from underneath his poncho and pointed it toward Juan. Collins ran as soon as he saw the gun. He heard gunshots and turned around. Juan yelled, "Anthony, Anthony." Collins saw Juan pick defendant up off of the ground in the middle of the street. Collins kept running. FN7

> FN7  When Collins spoke with police on December 5, 2003, he acknowledged going to 46th Avenue but would not give details as to what happened there.

17
18
19

Defense counsel argued to the jury the shooting of Hilarios resulted from defendant trying to protect himself from a hail of bullets fired by her companion, and not from an attempted robbery gone bad by Juan and defendant.

20

People v. Milton, 2011 WL 1782338, at *1-4 (footnotes in original).

21

Counsel argued Petitioner accidentally shot Hilarios when, from a distance,

22

he fired back at the person who was shooting at him and Juan.  4 RT at 742.

23

**DISCUSSION**

24

**I.    Standard of Review**

25

This Court may entertain a petition for a writ of habeas corpus "in behalf of a

26

person in custody pursuant to the judgment of a State court only on the ground that

27

he is in custody in violation of the Constitution or laws or treaties of the United

28

States."  28 U.S.C. § 2254(a).  The writ may not be granted with respect to any

claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings, as opposed to the dicta, of the Supreme Court as of the time of the state court decision. Id. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned

decision" of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion.  Ylst, 501 U.S. at 805.  In this case, the last reasoned opinion is that of the California Court of Appeal on direct review.

The Supreme Court has repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S.Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S.Ct. 1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Id. at 1307 (citation omitted).  With these principles in mind, the Court addresses Petitioner's claims.

## II.   Claims and Analysis

Petitioner claims the following as grounds for federal habeas relief: (1) trial counsel provided ineffective assistance; (2) the trial court violated Petitioner's constitutional rights by failing to give a limiting instruction and admitting evidence that Petitioner's brother, Juan, had been convicted of felony murder; and (3) the trial court violated Petitioner's constitutional rights by denying his motion to suppress his statement to police.

### A.   Ineffective Assistance of Counsel

Petitioner claims that he was denied effective assistance of counsel when counsel failed to object to evidence that Petitioner's brother, Juan Milton, had been convicted of murder based on the incident for which Petitioner was on trial.[1]

---

[1]Because Petitioner and his brother have the same last names, the brother will be referred to by his first name, "Juan."

United States District Court
For the Northern District of California

1.   **Background**

The Court of Appeal rejected this claim as follows:

1. Facts

The prosecution called Juan Milton as a witness.  Juan was asked the following questions and gave the following answers at the outset of his testimony on direct:

"Q. . . . [L]et me ask you this, you're currently a sentenced prisoner; is that correct?

"A. Yes.

"Q. Okay.  And you're serving time where?

"A. Lancaster.

"Q. Okay.  And what have you been convicted of?

"A. First-degree murder.

"Q. Okay.  And that is in relationship to this case where your brother shot the female.

"A. Yes."

After the prosecutor asked Juan a few more questions about a different subject, the court interrupted the questioning and instructed the jury as follows:  "Let me interrupt[.]  [T]o the extent it has come out that he is a sentenced prisoner, that's admissible for a limited purpose only.  It gives you the context of his position.  It has-under the law will be allowed to be considered by you for impeachment purposes. [] We had a witness who admitted a felony conviction previously, a recent one he has done, so it comes in for those limited purposes.  It doesn't come in for any other purpose at this time concerning anything about the incident in question.  You all understand that.  Okay. [] Go ahead."

After the close of evidence, the jury was also instructed as follows under CALJIC No. 2.23:  "The fact that a witness has been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the believability of that witness.  The fact of the conviction does not necessarily destroy or impair a witness's believability.  It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness."

Defense counsel interposed no objection to the prosecutor's questions about Juan's conviction, and he did not ask the court for a different instruction in relation to the testimony given on that subject.

2. Analysis

Defendant contends evidence of an accomplice's conviction based on the crime charged in the current case is irrelevant, inadmissible, and highly prejudicial to a defendant because it invites the jury to

United States District Court

For the Northern District of California

impermissibly rely on what they assume another jury has found rather than on their own assessment of the remaining defendant's personal culpability.  (See U.S. v. Mitchell (4th Cir. 1993) 1 F.3d 235, 240 (Mitchell); accord People v. Leonard (1983) 34 Cal. 3d 183, 188-189 (Leonard) [substantial prejudicial effect of accomplice's guilty plea to charged crime far outweighs evidence's probative value].)  According to defendant, his trial counsel "could have had no valid tactical reason for failing to object" to the evidence of Juan's first degree murder conviction, especially in view of the fact he did object later in the trial to the introduction of evidence that Juan's murder conviction was based on felony murder because the defense position was that there was no robbery attempt by defendant or his brother before Hilarios was shot.

. . .

At the outset, we reject defendant's claim that the evidence was irrelevant and inadmissible.  As the trial court's immediately ensuing instruction indicated, the evidence about Juan's felony conviction came in "for a limited purpose only" to give jurors "the context of [Juan's] position" and could be "considered . . . for impeachment purposes" and "[not] for any other purpose . . . *concerning anything about the incident in question*."  FN8  (Italics added.)  Evidence Juan was convicted of a felony was admissible for impeachment purposes. (Evid. Code, § 788; People v. Castro (1985) 38 Cal. 3d 301, 314.)

> FN8  The court's limiting instruction referred to "a witness who admitted a felony conviction previously, a recent one he has done," which could only refer to Juan.  Although the court did not reference Juan's admission that his conviction was "in relationship to this case," it was clear from the instruction as a whole and the context in which it was given that the court was cautioning the jury not to consider any of Juan's admissions about his conviction for any purpose other than impeachment.

. . .

Defendant asserts "the trial court did not give a limiting instruction preventing the jury from using the prior conviction [as substantive proof of his guilt]," and cites various cases in which no cautionary instruction was given.  But he fails to explain why the court's admonition to the jury-that Juan's testimony could not be considered "for any other purpose . . . concerning anything about the incident in question"-and use of CALJIC No. 2.23-were insufficient to address the jury's potential misuse of the evidence.  Defendant accepts the principle that when evidence of a testifying accomplice's conviction is admitted, a court should instruct the jury such evidence "is to be used only for the limited purpose of impeachment and not as substantive evidence of the defendant's guilt." . . . He cites no case holding limiting instructions comparable to the two given in this case violate that principle.  In U.S. v. Rewald (9th Cir. 1989) 889 F.2d 836, the court upheld the sufficiency of a single instruction given at the end of the trial that evidence of an accomplice's guilty plea was "relevant only to assess his credibility and was not 'evidence against the defendant.'" (Id. at p. 865.)  In United States v. Solomon (9th Cir. 1986) 795 F.2d 747, the court upheld the sufficiency of an instruction that "the [codefendants' guilty pleas] should not control or influence

United States District Court

For the Northern District of California

your verdict as to Mr. Solomon.  And you must base your verdict as to Mr. Solomon solely on the evidence that there is presented here against him."  (Id. at p. 748.)  Defendant fails to persuade us there is a constitutionally significant difference between admonishing the jury not to consider impeachment evidence against Juan as "'evidence against the defendant'" and admonishing it not to consider such evidence "for any other purpose . . . concerning anything about the incident in question" or to use it "only for the purpose of determining [Juan's] believability."  FN9

> FN9  In Baker v. United States (9th Cir. 1968) 393 F.2d 604, the court approved of an instruction that the jury could not consider the guilty plea of a testifying coconspirator "as evidence against any of the other defendants," and observed that, "No case has been called to our attention where, in the face of such a cautionary instruction, reversible error has been declared." (Id. at p. 614.)

Defendant claims there was no tactical reason for defense counsel's failure to object to the prosecution's impeachment of Juan since Juan gave testimony favorable to the defense.  But counsel did not know whether Juan's testimony would be helpful or harmful to his client when the impeachment evidence was offered.  It came at the very outset of Juan's testimony.  Juan acknowledged on cross-examination he had never spoken to defense counsel or discussed the case with him before the trial.  Juan had given so many different versions of what occurred on the night in question it would have been impossible for trial counsel to know whether everything he might say under an aggressive direct examination by the prosecution would support the defense theory.  It was therefore a reasonable tactical decision by defense counsel to allow Juan's prior conviction to come in for his own possible impeachment use.  We are also not persuaded counsel was ineffective for failing to request the evidence be "sanitized" to reflect a generic murder conviction.  (See People v. Hinton (2006) 37 Cal. 4th 839, 888 & fn. 17 [no ineffective assistance in failing to seek to sanitize evidence concerning the defendant's own prior convictions].)

Defendant further contends the trial court violated his constitutional right to due process by failing sua sponte to give a limiting instruction precluding the jury from using Juan's murder conviction as evidence against him.  Defendant's argument is considerably weakened by his decision to ignore the instruction the trial court did give at the time Juan testified as to his conviction.  In any event, absent an extraordinary likelihood of jury misuse, the trial court had no sua sponte duty to give limiting instructions on the use of evidence.  (People v. Hernandez (2004) 33 Cal. 4th 1040, 1051-1052.)  This is not one of those exceptional cases.  Limiting instructions were in fact given, the prosecution made no argument that Juan's conviction proved defendant's guilt, and there is no evidence the jury decided the case based on Juan's conviction.

We find no trial court error or ineffective assistance of counsel arising from Juan's testimony that he was convicted of murder in connection with Hilarios's shooting.

United States District Court

For the Northern District of California

1   <u>Milton</u>, 2011WL 172338, at *4-7 (footnotes in original).

2      Petitioner raised his ineffectiveness claim again in his petition for a writ of

3   habeas corpus in the California Court of Appeal and added, as extra-record

4   evidence, the declaration of his direct appeal counsel, Peter Gold.  Ex. J.  Gold

5   stated that he had spoken to trial counsel, Albert Thews, who said that he did not

6   object to the evidence about Juan's murder conviction because "he believed this

7   evidence merely showed that Juan was a convicted felon."  Ex. J at Ex. A.  Gold

8   stated that he drafted a declaration for Thews to sign, but he declined to sign it.  <u>Id.</u>

9      The California Supreme Court asked for a response from Respondent on

10  Petitioner's petition for review in that Court.  Respondent submitted with his

11  response a declaration from trial counsel, Thews.  Ex. K, Answer to Petition for

12  Review Ex. A, Thews Dec.  Thews stated that he did not object for the following

13  tactical reasons: (1) he wanted the jury to know that Juan was a convicted felon and

14  that he had been convicted of murder in this case; (2) the prosecutor asked Juan

15  about his murder conviction at the beginning of his testimony, at which point Thews

16  did not know how he would testify, especially given his previous and numerous

17  conflicting statements; and (3) he wanted to be able to use Juan's conviction, which

18  was a crime of moral turpitude, to impeach his trial testimony.  <u>Id.</u>

19              **2.    <u>Federal Authority</u>**

20      To prevail on a Sixth Amendment claim for ineffectiveness of counsel, a

21  petitioner must establish two things.  First, he must establish that counsel's

22  performance was deficient, i.e., that it fell below an "objective standard of

23  reasonableness" under prevailing professional norms.  <u>Strickland v. Washington</u>,

24  466 U.S. 668, 688 (1984).  Second, he must establish that he was prejudiced by

25  counsel's deficient performance, i.e., that "there is a reasonable probability that, but

26  for counsel's unprofessional errors, the result of the proceeding would have been

27  different."  <u>Id.</u> at 694.  A reasonable probability is a probability sufficient to

28  undermine confidence in the outcome of the proceedings.  <u>Id.</u>

United States District Court

For the Northern District of California

1    A "doubly" deferential judicial review is appropriate in analyzing ineffective

2    assistance of counsel claims under § 2254. <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388,

3    1410-11 (2011); <u>Premo v. Moore</u>, 131 S.Ct. 733, 740 (2011).  The general rule of

4    <u>Strickland</u>, i.e., to review a defense counsel's effectiveness with great deference,

5    gives the state courts greater leeway in applying that rule, which in turn "translates

6    to a narrower range of decisions that are objectively unreasonable under AEDPA."

7    <u>Cheney v. Washington</u>, 614 F.3d 987, 995 (9th Cir. 2010) (citing <u>Yarborough v.</u>

8    <u>Alvarado,</u> 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not

9    whether counsel's actions were reasonable.  The question is whether there is any

10   reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard."

11   <u>Harrington v. Richter</u>, 131 S.Ct. 770, 788 (2011).

12         **3.    <u>Analysis</u>**

13   Petitioner argues here, as he did in state court, that the evidence of Juan's

14   murder conviction was irrelevant to the determination of Petitioner's guilt.

15   However,  as the Court of Appeal explained, under California law, the evidence was

16   admissible and relevant for impeachment purposes. <u>Milton</u>, 2011 WL 1782338, at

17   *5.  The trial court's limiting instruction immediately after Juan acknowledged his

18   conviction, ensured that the jury only considered the evidence for impeachment, not

19   for any other purpose. <u>Id.</u> at *4.  The trial court gave a second limiting instruction at

20   the end of the trial. <u>Id.</u>  It is presumed that the jury followed the instructions it

21   received. <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000); <u>Richardson v. Marsh</u>, 481

22   U.S. 200, 206 (1987).  Counsel did not render deficient performance by failing to

23   bring a futile motion. <u>See Rupe v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996)

24   (failure to take a futile action can never constitute deficient performance).

25         Citing his appellate counsel's declaration, Petitioner argues that trial counsel

26   Thews had no valid tactical reason for failing to object to the evidence of Juan's

27   murder conviction.  However, Petitioner fails to address Thews' declaration stating

28   that he did not object to the evidence because it was admissible to impeach Juan and

United States District Court

For the Northern District of California

he wanted to be able to use it for his own impeachment purposes.  Ex. K, Ex. A, Thews Dec.  Thews also stated that, at the time the evidence was admitted, he did not know how Juan would testify because previously he had given multiple versions of events pertaining to Hilarios's murder.  Counsel's rationale is supported by the evidence.  See Milton, 2011 WL 1782338, at *7.  Because counsel's action are evaluated at the time they were made, not in hindsight, counsel's strategic decision not to object to the evidence did not constitute deficient performance.  See Lowry v. Lewis, 1 F.3d 344, 346 (9th Cir. 1994) (Counsel's conduct must be evaluated for purposes of the performance standard of Strickland "as of the time of counsel's conduct."); Strickland, 466 U.S. at 690.

Citing United States v. Binger, 469 F.2d 275, 276 (9th Cir. 1972), Petitioner argues that the limiting instructions given by the trial court were insufficient because they failed specifically to inform the jury that it could not use the evidence of Juan's conviction to determine Petitioner's guilt or innocence.  In Binger, the Ninth Circuit concluded that a similar jury instruction was insufficient to warn the jurors that a crime-partner's guilty plea was not evidence of the defendant's guilt.  Id.  However, the court held that the error was harmless because the government's evidence of the defendant's guilt was clear and convincing.  Id.

Assuming that the jury instructions were insufficient, no prejudice resulted from the admission of the evidence because the prosecutor's case against Petitioner was strong.  Because witness testimony placed Petitioner at the scene of the crime and physical evidence established that Petitioner's gun killed Hilarios, the question was not whether Petitioner shot and killed Hilarios, but whether he shot her in the course of an attempted robbery or in self defense.  See Milton, 2011 WL 1782338, at *8.  Smith testified that Juan gave Petitioner's gun to Simpson after the shooting.  1 RT 200-01.  The gun was recovered by the police and, during his interview with Cruz, Petitioner admitted the gun belonged to him.  Ex. F, People's Trial Ex. 1A at 3.  Juan admitted that Petitioner told him to check Hilarios's male companion's

13

pockets for money and that Juan followed these instructions.  2 RT 337-38; 345-46; 352; Ex. F, People's Trial Ex. 23d at 23; 42-44.   Juan stated that Petitioner fired his gun first.  Id. at 45.  Juan's admissions were corroborated by Petitioner's statements to the police that Juan had his hand in the pockets of one of Hilarios's companions and that Petitioner fired his gun without seeing anyone else with a gun.  Ex. F, People's Trial Ex. 25a at 7-14.  The location of bullet casings and the autopsy evidence that Hilarios was shot from a position directly in front of her was strong evidence that she was shot in the course of a robbery and not while Petitioner was trying to protect himself by shooting at Hilarios and her two companions from a distance, as Thews postulated in his closing argument.  4 RT 721-22.

In light of this strong evidence that Petitioner shot Hilarios in the course of an attempted robbery, Petitioner has failed to show that there is a reasonable probability that, but for counsel's failure to object to the evidence that Juan was convicted of murder, the result of the proceeding would have been different.  Accordingly, the claim of ineffective assistance of counsel is denied.

### B. Trial Court's Failure to Give Limiting Instruction

Petitioner contends the trial court violated his right to due process because it failed sua sponte to give the jury a limiting instruction precluding it from using Juan Milton's murder conviction as evidence in convicting Petitioner.

A state trial court's failure to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding.  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.  Id.  The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  Walker v. Endell, 850 F.2d at 475-76 (citing Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "especially heavy burden."  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).  The

1  significance of the omission of such an instruction may be evaluated by comparison

2  with the instructions that were given.  <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 971

3  (9th Cir. 2001).  A habeas petitioner is not entitled to relief unless the instructional

4  error "had substantial and injurious effect or influence in determining the jury's

5  verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

6       As discussed above, the trial court cured any prejudice from the admission of

7  the evidence that Juan was convicted of murder by giving the jury two limiting

8  instructions that it could use that evidence for no purpose other than impeachment.

9  As also discussed above, even if the limiting instructions did not cure any alleged

10  prejudice, the evidence that Petitioner shot Hilarios in the course of a robbery was

11  strong so that any error did not have a substantial and injurious effect or influence in

12  determining the jury's verdict.

13       The state court's denial of this claim was not objectively unreasonable.

14       **C.  <u>Admission of Juan Milton's Conviction of Felony-Murder</u>**

15       Petitioner contends his right to due process was violated when the trial court

16  admitted evidence that the basis of Juan Milton's murder conviction was felony-

17  murder.

18       **1.  <u>Background</u>**

19       The Court of Appeal summarized the facts pertaining to this claim as follows:

20      Under direct examination at defendant's trial, Juan was asked about many of
the statements he made to Sergeant Cruz concerning the events preceding the

21  shooting.  Juan repeatedly claimed Cruz did not allow him to say some things
he wanted to say.  In response, the prosecutor got Juan to admit that as part of

22  a sentencing deal he reached with the prosecution after his own trial, he
admitted he had lied when he testified at that trial Cruz had treated him

23  unfairly and did not let him say some things he wanted to say.  Then, under
cross-examination at defendant's trial, Juan again claimed much of what he

24  had told Cruz and others was a lie.

25      After this testimony, the prosecution sought to impeach Juan's
testimony with a transcript of his admission at his sentencing hearing

26  to the effect that Cruz had not coerced him to say things he did not
want to say.  Defendant objected.  As a backup position, defense

27  counsel insisted if the portion of the transcript containing the
admission was read to the jury, other portions should also be read to

28  show Juan was coerced into making the admission in order to avoid a
life-without-parole sentence.  The court ruled it would admit the

**United States District Court**

For the Northern District of California

> portion sought by the prosecution and reserve a ruling on defendant's request until later. The court took judicial notice of a portion of the transcript, which it read to the jury, in which Juan admitted (1) Cruz had not coerced or threatened him, (2) the portions of his statement to Cruz in which he described his brother and himself participating in a robbery at the time Hilarios was killed were true, and (3) his statements to the contrary at his trial were false.
>
> Before the close of the defense case, defendant proposed specific further passages from Juan's sentencing hearing be read explaining the reasons Juan retracted his trial testimony. The prosecution argued the reading should also include a passage in which the prosecutor in Juan's case explained the reasons why he was proposing a lesser sentence, which included the fact Juan was found guilty of felony murder, not of being the shooter. Over the defense's objection, the trial court took judicial notice of the passages proposed by both sides and read them to the jury. The prosecution portion disclosed that the prosecution in Juan's case was willing to have the special circumstance allegation against Juan dismissed, in part, because he was 19 years old, and "was the non-shooter in a felony murder situation," and would agree to waive his appeal.

Milton, 2012 WL 172338, at *7-8.

The Court of Appeal found that the felony-murder reference was not relevant to impeach any witness's testimony or for any other substantive purpose. However, in light of the overwhelming evidence against Petitioner, it rejected the claim because it was not reasonably probable that the verdict against Petitioner was affected by the passing mention of the basis of Juan's conviction. Id. at *8-9.

## 2.    **Federal Authority**

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.3d 984, 990 (9th Cir. 1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Even if an evidentiary error is of

16

constitutional dimension, habeas relief cannot be granted unless the error had a substantial and injurious effect on the verdict.  Brecht, 507 U.S. at 623; Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

### 3.   **Analysis**

This claim fails because no Supreme Court authority holds that admission of irrelevant or prejudicial evidence constitutes a due process violation.  See Holley, 568 F.3d at 1101.  Therefore, the Court of Appeal's rejection of this claim was not contrary to or an unreasonable application of Supreme Court authority.

Furthermore, even though the Court of Appeal found that the felony-murder reference was not relevant for any purpose, it noted that the evidence was admitted to explain the willingness of Juan's prosecutor to have the special circumstances finding against him stricken and to negotiate a reduced sentence.  Milton, 2011 WL 1782338, *8.  Because there was some permissible use for the evidence, its admission did not constitute a due process violation. See Jammal, 926 F.3d at 920.

Finally, even assuming the trial court erred in admitting the evidence, it did not prejudice Petitioner's defense.  In her closing argument, the prosecutor focused on the evidence of Petitioner's guilt; she did not mention Juan's role as the non-shooter in a felony-murder conviction.  See 4 RT 704-36; 751-63, Prosecutor's Closing and Rebuttal Arguments.  And, discussed previously, the evidence against Petitioner was strong.  Given the strong evidence against Petitioner, the brief mention that Juan was convicted of felony-murder did not have a substantial and injurious effect or influence on the jury's verdict.  See Brecht, 507 U.S. at 637.

### D.   **Failure to Suppress Petitioner's Statement to Police**

Petitioner argues the trial court violated his due process rights and his privilege against self-incrimination by admitting the statement he made to Sergeant Louis Cruz while Petitioner was in the hospital.  Petitioner asserts that, because he was in pain from gunshot wounds and was on medication, his statement was not freely or voluntarily given.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

### 1.   **Background**

Before trial, Petitioner moved to suppress the statement he made to Cruz when he was in the hospital.  At the suppression hearing, Cruz testified to the following: As primary investigator in the case, he went to Highland Hospital with Sergeant Mark Dunakin at approximately 4:00 p.m. on December 3, 2003, to speak with Petitioner.  1 RT 55, 57.  Petitioner had been treated in the emergency room and was in "a regular hospital room receiving care at a very high level."  1 RT 61.  Although Petitioner's voice was low, he was lucid and could carry on a conversation.  1 RT 57, 66-67.  Cruz turned on the tape recorder and advised Petitioner of his Miranda rights.  1 RT 58.  Cruz did not make any threats or offers of leniency.  1 RT 63.  Petitioner agreed to speak with Cruz.  1 RT 59.  Petitioner said he "can't really talk that much," so he asked Cruz to ask "me questions, I could give you the answers."  Ex. F, People's Trial Ex. 1A at 2.  Cruz had difficulty gauging Petitioner's pain level, but he "could definitely tell [he] had trouble speaking" and "definitely had a breath issue."  1 RT 61, 66.  Petitioner had upper torso wounds, with one lung punctured by a bullet.  1 RT 66.

Petitioner appeared to be in physical discomfort from the gunshot wounds, but during the entire interview, he appeared lucid.  1 RT 66-69.  Cruz based this conclusion on the quality of Petitioner's answers to the questions and the fact that Petitioner noticed pictures that Cruz had and identified what they were before Cruz "was actually able to put the picture all the way in front of his face."  1 RT 67.  Petitioner identified a photograph of a Tech-9-type firearm with tape around the magazine as his gun, which he had during the incident.  1 RT 60, Ex. F,  People's Trial Ex. 1A at 3.  Petitioner said he fired his gun once or twice after he was shot.  Ex. F, People's Trial Ex. 1A at 3-6.  He stated that the "Mexicans" fired at him after his brother went into their pockets.  Id.  Throughout the interview, Petitioner identified people, talked about what had happened, knew where he was, knew how he had received the weapon that he identified as belonging to him and how long he

had owned the weapon.  1 RT 67-68.  Cruz stated, "the quality of his answers to the questions reflected that he was understanding what was going on."  1 RT 68.  The interview lasted twenty-four minutes.  1 RT 64.

After Cruz's testimony, the prosecutor indicated that the interview took place thirteen hours after Petitioner had been shot.  1 RT 71.  However, the Court of Appeal, based on its review of the evidence, determined that the interview took place thirty-nine hours after Petitioner was shot.  Milton, 2011 WL 1782338, at *9 n.10.  The trial court stated that it had Petitioner's medical records and defense counsel stated he had reviewed the medical records while examining Cruz, and Cruz's testimony was "pretty accurate as to what the medical records reflect."  1 RT 71, 72.

The trial court ruled as follows:

I clearly have a young, not quite 18-year old in substantial distress in the hospital, the distress is clearly from gunshot wounds.  He clearly is marked a suspect; that's why he is given Miranda rights, whether he knows it or not.

It is clear he's in custody.

. . .

I am supposed to measure how free and voluntary [his Miranda waiver was].

The actual Miranda warnings were given and there can be no violation of Miranda, in the sense of, how he was treated.  There is no discussion beforehand that's meaningful.  There is no dispute about that.  His rights are given, clearly, preserved as such.  He responds clearly.  And it's: how much does his condition weigh?

And that really is captured by the answer of the Sergeant in talking about this perception, I believe on cross but he began that answer with pointing to the quality of the defendant's answers, highlighted things that are clear from the tape, and ended with the quality of the defendant's answers.

He, far better than average, in terms of statements I've heard, understands the questions.  There is no lack of understanding, and his answers respond again and again directly to the questions.

He, on occasion, is inconsistent, and the inconsistency repeatedly appears to be one consistent with protecting himself, and then later on concedes some of that protection in the direction of the truth.

. . .

United States District Court

For the Northern District of California

He has some clear understanding what's happened here may have him in substantial trouble, and it may not have him in as much trouble as he deserves. Thus, at the end, he wants to know if he is going to be able to get out, can he leave? And there is nothing in the tone of the officer that would in any way affect the voluntariness of all this.

So as I weigh all of this, I have a really clear picture . . . [The statement] is freely given. The defendant is voluntarily doing this. Nothing inappropriate is happening by the police.

. . .

This is something the jury should be able to hear. Arguments that go to reliability, to voluntariness. At this point, as a legal matter, should not lead to suppression. It may be good argument to tell a jury why everything they heard shouldn't be taken a certain way that incriminates, but the reality is, this is valid evidence that is fair to be presented before a jury.

This is total compliance with Miranda. Nothing about the defendant's situation is such that this evidence should be suppressed on any voluntariness theory, and it is his own words, his own intonations, his whole context of his statement that has no real possibility of being misconstrued because of the events that the police created before that, that can affect him. Here is the contact, and here we go with the tape. That makes it really clean and it makes me very comfortable with my ruling.

1 RT 80-82.

The Court of Appeal concluded that, despite Petitioner's physical condition, "there is ample evidence he understood his rights and voluntarily waived them." Milton 2011 WL 1782338, at *11.

### 2.   **Federal Authority**

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. Miranda requires that a person subjected to custodial interrogation be advised that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." Id. at 444. Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently. Id. at 475. The distinction between a claim that a Miranda waiver was not voluntary, and a claim that such waiver was not knowing and intelligent is important. Cox v. Del Papa, 542

United States District Court

For the Northern District of California

F.3d 669, 675 (9th Cir. 2008).  The voluntariness component turns on the absence of police overreaching, i.e., external factors, whereas the cognitive component depends upon the defendant's mental capacity.  Id.  A valid waiver of Miranda rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant.  United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986).  The government must prove waiver by a preponderance of the evidence.  Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).

### 3.    Analysis

Petitioner argues here, as he did in state court, that his waiver was not voluntary because Cruz's interrogation took place just thirteen hours after Petitioner had been shot in the chest and he was receiving medical attention "at a very high level" with tubes attaching him to machines.  Petition at 32.[2]  Cruz admitted that Petitioner was in substantial distress, had trouble breathing and could not speak in a normal tone of voice.  Id.  Petitioner argues that, under these circumstances, he could not voluntarily waive his Miranda rights.

However, the fact that Petitioner was receiving medical care and was in pain, does not, alone, render him unable to voluntarily waive his Miranda rights.  Courts examine the facts of each case and determine under the totality of the circumstances whether the defendant freely, knowingly and voluntarily waived his rights.  Moran v. Burbine, 475 U.S. 412, 421 (1986).

As reasonably found by the Court of Appeal, ample evidence supported the conclusion that Petitioner understood his rights and voluntarily waived them.  Cruz was respectful throughout the interview, no discussion occurred before the tape recorder was turned on and the interview itself lasted only twenty-four minutes.

---

[2]As indicated above, the Court of Appeal found that thirty-nine hours had elapsed before Cruz interviewed Petitioner.  See Milton, 2011 WL 1782338, at *9 n.10.  Petitioner does not rebut this finding of fact with clear and convincing evidence and, thus, it is presumed to be correct.  See 28 U.S.C. § 2254(e)(1) (federal habeas court must presume correct any determination of a factual issue made by state court unless petitioner rebuts the presumption of correctness by clear and convincing evidence).

United States District Court

For the Northern District of California

1   Therefore, no police coercion took place and, in this regard, the confession was

2   voluntary.  The pertinent question is, given Petitioner's physical condition, whether

3   he had the mental capacity to understand the significance of his waiver and the

4   questions he was answering.  The Court of Appeal found the following evidence

5   showed that Petitioner understood the rights he was waiving and the significance of

6   Cruz's questions: First, Petitioner directed how the officers were to conduct the

7   interview by telling them that, although he had trouble speaking, if they asked him

8   questions, he would answer them.  Second, he clearly understood the questions

9   asked and gave prompt, responsive answers, including details and times.  Third, he

10  recognized and identified pictures, such as the picture of his gun. And, significantly,

11  he offered mostly false and evasive answers about the shooting, showing that he was

12  aware of the nature of his situation and the significance of his answers.  This

13  evidence does not suggest that Petitioner's judgment or ability to waive his rights

14  was affected by the medical treatment he was receiving or the pain he was

15  experiencing.  In light of the totality of these circumstances, the state courts' denial

16  of this claim was not contrary to or an objectively unreasonable application of

17  Miranda.

18      Petitioner argues that the prosecutor's failure to introduce evidence about the

19  nature of Petitioner's medications or their effect on him necessitates against finding

20  a valid waiver.  Although Petitioner's medical records were not explicitly discussed

21  at the hearing, the trial court stated it had Petitioner's medical records and this was

22  corroborated by defense counsel.  1 RT 71-72.  Thus, Petitioner's argument is

23  unpersuasive.

24      Even assuming the court erred in admitting Petitioner's statement, it did not

25  have a substantial and injurious effect or influence in determining the jury's verdict

26  because evidence, other than the statement, established that Petitioner shot Hilarios

27  in the course of an attempted robbery.   The strong case against Petitioner has been

28  described previously.  A summary of the salient evidence includes the following:

1    Petitioner's gun was matched to the bullet killing Hilarios by ballistics and forensics

2    showed the bullet was shot from close range, contradicting the defense theory that

3    Petitioner shot in self-defense from a distance.  4 RT 721-22.  Juan told Cruz that

4    Petitioner told him to go into Hilarios's companion's pockets to look for money and

5    Juan did so.  4 RT 729.  Juan also told Cruz that, after Hilarios was shot, everyone

6    started running.  4 RT 731.

7    Although the prosecutor cited Petitioner's statement in her closing argument,

8    she told the jury that, under the corpus delicti rule, the statement alone would be

9    insufficient to prove his guilt.  4 RT 721.  She then detailed the other evidence

10   showing that Petitioner and Juan were perpetrating a robbery and that Hilarios was

11   shot during the course of that robbery before Petitioner reached a place of safety,

12   establishing the prosecution's felony-murder theory of the shooting.  4 RT 731.

13   In light of the overwhelming evidence of Petitioner's guilt, independent of his

14   statement to Cruz, Petitioner fails to show that any alleged error in admitting his

15   statement had a substantial and injurious effect or influence on the jury's verdict.

16   **CONCLUSION**

17   After a careful review of the record and pertinent law, the Court concludes

18   that the Petition for a Writ of Habeas Corpus must be **DENIED**.

19   Further, a Certificate of Appealability is **DENIED**.  See Rule 11(a) of the

20   Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial

21   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has

22   Petitioner demonstrated that "reasonable jurists would find the district court's

23   assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel,

24   529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of

25   Appealability in this Court but may seek a certificate from the Court of Appeals

26   under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the

27   Rules Governing Section 2254 Cases.

28   The Clerk shall terminate any pending motions, enter judgment in favor of

*United States District Court*
For the Northern District of California

Respondent, and close the file.

**IT IS SO ORDERED.**

DATED: _____5/20/2015_____

EDWARD J. DAVILA
United States District Judge